tion of the witness was not specially directed to the peculiarities of the penmanship. It would be dangerous, in a criminal case, to rely on such vague and unsatisfactory evidence as the basis of a verdict which will subject the accused to severe punishment and operate as a perpetual brand of infamy on his character.

If the jury are of the opinion that the letter inclosing the draft addressed to Benedict was not written by the defendant, or that the evidence as to that fact leaves it in doubt whether he was the writer, they will inquire whether there are other facts in proof which satisfactorily establish his guilt. Apart from the alleged possession of the draft, there is no evidence that the defendant has been in possession of anything which was taken from the mail. It is stated by one witness, Mr. Faris, that some short time after the receipt of the proceeds of the draft the defendant requested him to change a $50 bank-note on the Merchants and Manufacturers' Bank of Wheeling. And this fact is relied on as sustaining the inference that this was one of the notes remitted by Benedict in the purchase of the draft sent to him by the person calling himself Martin Smith. There is no proof, however, identifying this as one of the notes sent by Benedict. It will, however, be for the jury to give such weight to this evidence as it may be fairly entitled to. If the note exchanged by Faris, at the request of the defendant, was one of the notes sent in Benedict's letter addressed to Smith, it would undoubtedly be a fact strongly implicating the defendant, and which, unexplained, would be sufficient to warrant the inference of his guilt.

As to the fifth count of the indictment, charging defendant with having unlawfully and fraudulently taken Benedict's letter addressed to Martin Smith from the post-office at Beverly, to which it was directed, there seems to be no satisfactory evidence. Indeed, the only fact relied on to establish this charge is that before noticed, namely, that the defendant had the possession of a $50 Wheeling bank-note. For the reason already adverted to, the jury will no doubt hesitate in giving much weight to this fact.

The case is submitted to the jury, with the remark that it will be their duty to give the defendant the benefit of the evidence adduced by him to prove his previous good standing and character in the community in which he lived. Several respectable and intelligent witnesses have testified directly and positively to his good character, and their evidence on the point is not impeached or contradicted. It is also a fact brought to light by the evidence, that some months after this transaction, and when it was made known to the defendant that he was suspected of having stolen from the mail, though then in the distant state of Missouri, he immediately returned to his former residence in Ohio, and courted a full investigation of the charge.

This, with the proof of his good character, is entitled to the consideration of the jury, unless the evidence of guilt is so clear as to leave no reasonable doubt in their minds.

The jury returned a verdict of not guilty.

---

UNITED STATES (CROWELL v.). See Case No. 3,447.

---

## Case No. 14,896.

### UNITED STATES v. CROZIER.

District Court, D. Tennessee.    Feb. 1, 1869.

CRIMINAL LAW—PARDON.

The president had power, by the amnesty proclamation of 1868, to pardon all of a particular class of political offenders.

[Cited in 2 Brightley, Dig. 140, to the point as given above. Nowhere more fully reported; opinion not now accessible.]

---

## Case No. 14,897.

UNITED STATES v. CRUIKSHANK et al.

[1 Woods, 308: [1] 13 Am. Law Reg. (N. S.) 630.]

Circuit Court, D. Louisiana. April Term, 1874.[2]

CIVIL RIGHTS BILL — INDICTMENT FOR VIOLATION —FOURTEENTH AND FIFTEENTH AMENDMENTS TO CONSTITUTION — RIGHT TO VOTE — INJURIES TO NEGROES—HOW COGNIZABLE.

1. An indictment, under the enforcement act or civil rights bill, for violating civil rights, should state that the offense charged was committed against the person injured by reason of his race, color or previous condition of servitude.

2. A charge that the defendants conspired to injure certain persons of African descent, being citizens of the United States, thereby to prevent them from exercising their rights as citizens, such as the right to peaceably assemble, to bear arms, etc., unless accompanied with an averment that the injury was committed by reason of the race, color, or previous condition of servitude of the person conspired against, is not sustainable in the courts of the United States.

3. Congress has power to legislate for the enforcement of any right granted by the constitution; but the power must be exercised according to the nature of the grant or guaranty. If it only be that congress or the legislature of a state shall not pass laws for abridging the right, it is a guaranty against acts of the government only, state or federal, and not against the acts of individuals; and in such case congress has not power to legislate over the subject generally; but only to provide remedies or redress in case the legislature or congress itself (as the case may be) should violate the prohibition. The fourteenth amendment of the constitution does not change the power of congress in this respect.

[Cited in Le Grand v. U. S., 12 Fed. 580; U. S. v. Harris, 106 U. S. 638, 1 Sup. Ct. 608; Logan v. U. S., 12 Sup. Ct. 624; Green v. Elbert, 11 C. C. A. 207, 63 Fed. 309.]

4. The thirteenth amendment confers upon congress full power to legislate on the subject of

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]
[2] [Affirmed in 92 U. S. 542.]